AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Southern District of California

**FILED**

MAR 0 8 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

One (1) Freetel Cellular Phone
IMEI:358140071563607
Model: FTU161F

)
)
)
)
)
)

Case No. `18MJ1101`

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Attachment A, incorporated herein.

located in the _____ **Southern** _____ District of _____ **California** _____ , there is now concealed *(identify the person or describe the property to be seized):*

Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Methamphetamine and Cocaine |

The application is based on these facts:

See attached affidavit of HSI Special Agent Keith Laughlin, incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Keith Laughlin, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/8/18

_____
*Judge's signature*

City and state:  San Diego, CA

Honorable Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Keith Laughlin, Special Agent ("SA") with the Department of Homeland Security, ("DHS"), Homeland Security Investigations ("HSI"), after being duly sworn, hereby state as follows:

## INTRODUCTION

1.      I make this affidavit in support of an application for a warrant to search the following electronic device, as further described in Attachment A, and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952, 960, and 963, as more particularly described in Attachment B:

> Freetel cellular phone
> Model: FTU161F
> Serial Number: 161FMX043P75204216
> IMEI: 358140071563607
> (**"Target Telephone"**)

This search supports an investigation and prosecution of Ricardo IBARRA de la TOBA ("IBARRA") for the crimes mentioned above.   A factual explanation supporting probable cause follows.

2.      Customs and Border Protection ("CBP") Officers seized the **Target Telephone** from Defendant on November 30, 2017, when he was arrested at the Otay Mesa, California, Port of Entry ("POE"), attempting to smuggle methamphetamine and cocaine into the United States.   The **Target Telephone** is currently in the possession of CBP at 9495 Customhouse Plaza, San Diego, CA

92154, in the Southern District of California.

3.      As set forth in more detail below, there is probable cause to believe that a search of the **Target Telephone** will produce evidence of the aforementioned crimes, as described in Attachment B.

4.      The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. Because this affidavit is submitted for the limited purpose of obtaining a search warrant for the **Target Telephone**, it does not set forth every fact known by me or others regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5.      I have been employed as a SA with HSI since August of 2006. I am currently assigned to HSI's Cargo Smuggling Group, specifically working on HSI's San Diego fentanyl initiative to combat fentanyl smuggling and distribution. In that capacity, my primary responsibility is investigating, arresting, and prosecuting members of narcotics smuggling organizations that utilize the Southern and Central Districts of California as an operational corridor, as well as other offenses that occur at the Ports of Entry in San Diego County, including assaults on federal officers, escapes from federal custody, and a variety of other federal offenses. Prior to becoming a SA with HSI, I served as a Customs

Inspector for 6 years, having graduated the United States Customs Inspector Basic Training Academy in April of 2000.

6.      Prior to becoming a SA, I attended and successfully completed the Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training at the Federal Law Enforcement Training Center in Brunswick, Georgia.  The combined Academy curriculums covered specialized training in the Immigration and Naturalization Act, criminal investigations, criminal law, and statutory authority, as well as cross-training in Title 21 United States Code, controlled substances violations, and in Title 19 United States Code, customs law violations.

7.      During the course of my employment with HSI and with the United States Customs Service, I have conducted over 70 investigations and assisted in numerous more.  I have participated in and conducted investigations involving violations of various State and Federal criminal laws, including unlawful possession with intent to distribute controlled substances (including scheduled pharmaceutical drugs), distribution of controlled substances, use of communication facilities to commit controlled substance offenses, and importation of controlled substances.  I have interviewed hundreds of individuals that were directly involved in selling, using, importing, trafficking, distributing controlled substances, and money laundering, all in violation of Title 21 and Title 18, United States Code.

Many of these investigations have resulted in the issuance of arrest warrants, search warrants, seizure warrants and the indictments and arrests of persons for a variety of federal and state offenses. I have conducted investigations concerning the identification of co-conspirators through the use of communication facilities, financial records, commercial and government databases, drug ledgers, photographs, and other documents.

9.    8.    Through my training and experience, I have gained a working knowledge and insight into the typical workings of narcotics smuggling organizations. I have also gained extensive information as to the normal operational habits of persons who make their living as narcotics smugglers. I am aware that it is a common practice for narcotics smugglers to use cellular telephones, pagers and portable radios to maintain communications with co-conspirators and coordinate smuggling arrangements to further their criminal activities.

10.    In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of criminal investigations, and the opinions stated below are shared by them.

11.    Based upon my training and experience as a SA, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a. Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b. Drug smugglers will use cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c. Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d. Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e. Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f. Drug smugglers and their co-conspirators often use cellular telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g. The use of cellular telephones by conspirators or drug smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and locations data.

12. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

13.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone.  Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

  a.    tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States;

  b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

  c.    tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

  d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

  e.    tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

14.    On November 30, 2017, at approximately 1:10 a.m., IBARRA was the driver of a 2004 Ford F-150 truck ("Ford") and was waiting in the pre-primary lanes at the Otay Mesa POE. CBP Officer Magallanes was working pre-primary with his assigned Narcotics and Human Detector Dog ("NHDD"), "Sandy", when Sandy alerted to a trained odor coming from the passenger-side front fender of the Ford. CBP Officer Hernandez obtained a negative customs declaration from IBARRA, who also advised that he was going to San Bernardino. Due to the canine alert, IBARRA was handcuffed and taken to a secure area, pending the inspection of the Ford.

12.    During secondary inspection, CBP Officer Daisy Gonzalez conducted an intensive exam of the Ford and removed the passenger-side front quarter panel and discovered a non-factory compartment within the firewall, running the entire width of the engine compartment. CBP Officer Gonzalez extracted a total of twenty-nine packages, with a combined weight of 14.34 kilograms, which field-tested positive (GEMINI) for methamphetamine. CBP Officer Gonzalez also extracted two additional packages from the compartment, with a combined weight of 2.60 kilograms, which field-tested positive (GEMINI) for cocaine. IBARRA was

thereafter arrested and placed in a holding cell for violations of 21 U.S.C. §§ 952 and 960, Importation of Methamphetamine and Cocaine.

13.    Post-arrest, CBP Officer Manuel Acevedo and I removed IBARRA from the holding cell and obtained basic biographical information from him. CBP Officer Acevedo was there, in part, as a translator.  CBP Officer Acevedo asked IBARRA to remove the cash that he had in his pocket and explained that the money would be stored with IBARRA's personal property.  IBARRA took out $390 that he had in his pocket and then proceeded to pull the **Target Telephone** from his pocket.  It was at this point that CBP Officer Acevedo and I became aware that CBP officers had missed the **Target Telephone** during IBARRA's initial pat-down and that he had the **Target Telephone** with him while in the cell.  We subsequently seized the **Target Telephone**.

14.    I analyzed IBARRA's crossing history and determined that there were thirty-six northbound crossings for IBARRA with the Ford, including November 30, 2017, the day of the seizure/arrest.  According to the records, IBARRA was accompanied by an individual identified as Ricardo SALIDO Montijo ("SALIDO) on five of those occasions: June 27, June 29, July 1, July 8, and July 11, 2017. SALIDO is a Mexican citizen with a Border Crossing Card.  After the July 11, 2017 crossing, SALIDO did not cross into the United States again until November 7, 2017, at which point he crossed in a Chevrolet pickup truck ("Chevrolet").  Both

the Chevrolet and IBARRA's Ford have similar utility racks, which surround the trucks and extend several feet above the trucks, making these trucks too tall to be screened by the Z-Portal X-ray scanner.

15. Crossing records show that on the day of IBARRA's seizure/arrest, the Chevrolet crossed, northbound into the United States, at the Otay Mesa POE, approximately ten minutes after IBARRA. According to the records, the Chevrolet was driven by SALIDO, who was the sole occupant.

16. The next time the Chevrolet crossed into the United States, on December 5, 2017, it was referred for an intensive inspection. A CBP NHDD alerted to the interior cab of the Chevrolet. CBP officers discovered that the Chevrolet had a non-factory roof compartment, which was empty at the time of inspection. On this entry, SALIDO was the sole occupant of the Chevrolet.

17. Based on my training, experience, the location of the drugs, and the manner of concealment, I believe the packages consisted of drugs intended for importation and distribution. Based upon my experience and investigation in this case, I believe that IBARRA, as well as SALIDO and other persons yet unknown, were involved in an on-going conspiracy to import and distribute cocaine and methamphetamine. Based on my experience investigating narcotics smugglers, I also believe that IBARRA likely used the **Target Telephone** to coordinate with co-conspirators regarding the importation and distribution of the cocaine and

methamphetamine, and to further this conspiracy both inside and outside of the United States. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of cellular telephones, which may identify other persons involved in narcotics trafficking activities.

18. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of IBARRA and his co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information, are stored in the memory of the cellular telephones described herein.

19. Finally, I also know that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement. In my professional experience, this requires planning and coordination in the weeks and often months prior to the event. This planning often includes coordination on crossing the border to develop a crossing history or pattern. Therefore, this warrant seeks data from the **Target Telephone** for the period of June 27, 2017 through December 1, 2017. I request that the search period commence on June 27, 2017 because that is the first

time that IBARRA drove across the border in the Ford. I request that the period extend one day beyond the date of IBARRA's arrest (December 1, 2017) because, based on training, experience, and consultation with other law enforcement officers, I am aware that co-conspirators of narcotics smugglers and traffickers are commonly unaware of the subject's arrest and will continue to attempt to contact the subject for information related to the narcotics even after the arrest.

## METHODOLOGY

20.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their devices over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the

network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

21.    Following the issuance of this warrant, I will collect the **Target Telephone** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

22.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The

personnel conducting the identification and extraction of data will complete the

analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

23. Based on all of the facts and circumstances described above, I believe

that probable cause exists to conclude Defendant used the **Target Telephone** to

facilitate violations of Title 21, United States Code, Sections 952, 960, and 963.

24. Because the **Target Telephone** was seized during the investigation of

IBARRA's smuggling activities and has been securely stored, there is probable

cause to believe that evidence of illegal activities committed by IBARRA

continues to exist on the **Target Telephone**. As stated above, I believe that the

appropriate date range for this search is from June 27, 2017 to December 1, 2017.

25. WHEREFORE, I request that the court issue a warrant authorizing

law enforcement agents and/or other federal and state law enforcement officers to

search the **Target Telephone**, as described in Attachment A, and seize the items

listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and

belief.

Keith Laughlin
Special Agent
Homeland Securities Investigations

Page 13

Subscribed and sworn to before me this ____8th____ day of March 2018.

The Honorable Karen S. Crawford
United States Magistrate Judge

Page 14